United States Court of Appeals,

Fifth Circuit.

Nos. 94-60800, 95-60091.

PYCA INDUSTRIES, INC., Plaintiff-Appellee Cross-Appellant,

and

D. Reynolds Company, Inc., doing business as Reynolds Company, The, Plaintiff,

v.

HARRISON COUNTY WASTE WATER MANAGEMENT DISTRICT, Defendant-Appellant Cross-Appellee,

and

Owen and White, Inc.;  Max Foote Construction Company, Inc.; Fidelity and Deposit Company of Maryland, Defendants-Appellees.

PYCA INDUSTRIES, INC.;  D. Reynolds Company, Inc., doing business as Reynolds Company, The, Plaintiffs-Appellees.

v.

HARRISON COUNTY WASTE WATER MANAGEMENT DISTRICT, Defendant-Appellant,

and

Owen and White, Inc.;  Max Foote Construction Company, Inc.; Fidelity and Deposit Company of Maryland, Defendants-Appellees.

May 3, 1996.

Appeals from the United States District Court for the Southern District of Mississippi.

Before JOLLY, JONES and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

The central issues of these interlocutory appeals are whether the Harrison County Wastewater Management District ("the District") is a citizen for diversity jurisdiction purposes and, if so, whether under Mississippi law it is a political subdivision of the

state entitling it to sovereign immunity from tort claims. Because we conclude that the District is a person for diversity purposes, we agree with the district court that it had jurisdiction over the claims asserted. However, because we also conclude that the District is a political subdivision of the state, the District is immune from the tort claims and we accordingly reverse that part of the judgment of the district court denying tort immunity.

FACTUAL AND PROCEDURAL BACKGROUND

The underlying litigation in this case involves multiple contract and tort claims among several different parties arising out of the construction of the West Biloxi Wastewater Treatment Facility. Appellant Harrison County Wastewater Management District hired Max Foote Construction Co. ("Foote") as the general contractor for the project. Owen & White ("O & W") was the project engineer. Appellee PYCA Industries, Inc. ("PYCA") is an electrical subcontractor that was awarded a subcontract on the project. In preparing its bid, PYCA made commitments for the purchase of certain equipment from electrical equipment suppliers.

While the project was ongoing, PYCA proposed revisions in the electrical portion of the project that would net substantial savings to the District. After being initially rejected by O & W, the District ultimately directed O & W to implement the changes. These changes decreased the amount of work required and thus the amount due PYCA. Consequently, the District was entitled to change order credits. The principle dispute underlying this case is the amount of these credits.

2

PYCA believed the credit should be significantly less than the District. The District, through O & W, arrived at its larger credit figure by obtaining price quotes from additional electrical equipment suppliers. PYCA continued to object and refused to complete its subcontract until the credit dispute was resolved. Subsequently, the District and O & W allegedly threatened Foote with termination of the general contract. Foote, in turn, pressured PYCA. PYCA then complied by completing its part of the project despite the credit dispute. Later, the District and O & W required PYCA to provide the cost breakdown of its electrical equipment. Believing PYCA's suppliers were too high, the District and O & W increased the amount of the credit due. Apparently, this forced PYCA to breach its purchase price commitments with its suppliers.

In August 1991, PYCA sued the District, O & W, Foote, and Fidelity & Deposit Company of Maryland (Foote's surety under a labor and materials bond). PYCA alleged breach of contract and tortious interference with contract claims. In addition, PYCA included claims for punitive damages.

A flurry of motions to dismiss and for partial summary judgment ensued below. In an attempt to winnow the issues for trial, the district court issued several opinions and accompanying orders, often referencing one another, disposing of these motions. Because the issues addressed by these various opinions and orders define the parameters of what is properly before us, it is necessary to describe them in some detail.

Initially, the District moved to dismiss the claims against it for lack of diversity jurisdiction. The District's position was based upon the argument that it was the alter ego of the State of Mississippi and therefore not a "citizen" for diversity purposes. On January 18, 1994, the district court issued a 58-page opinion dealing with, *inter alia,* the District's motion to dismiss for lack of jurisdiction. Finding that the District was not the alter ego of the state, the court denied the motion in a subsequent order filed February 9th, referencing the January 18th opinion. The District sought and received certification from the district court for an interlocutory appeal of this order under both 28 U.S.C. § 1292(b) and Federal Rule of Civil Procedure 54(b). The District now appeals the court's failure to dismiss for lack of jurisdiction.

Also on January 18th, the district court issued a 25-page opinion dealing with Foote and O & W's motion for partial summary judgment on punitive damages. In an order filed January 31, 1994, the district court granted Foote's motion, but denied O & W's. In a subsequent clarification order, filed November 8, 1994, the district court held that O & W was also immune from punitive damages. No one sought certification of these two specific orders for interlocutory appeal. Nonetheless, PYCA cross-appeals on the propriety of dismissing its punitive damage claims. Foote and O & W contend in a pending motion that the lack of certification deprives us of appellate jurisdiction.

In June 1994, the District moved to amend its answer to assert

4

cross-claims against Foote and O & W and counterclaims against PYCA based upon allegations of possible fraud and conspiracy. This motion to amend, made nearly three years into the litigation, was denied by the magistrate judge. On October 3, 1994, the district court upheld the magistrate judge's denial of the District's motion to amend. Surprisingly, this order was also certified for interlocutory appeal under Rule 54(b). The District appeals the denial of its motion to amend.

Also on October 3, 1994, the district court filed a third opinion relating primarily to the District's summary judgment motion based upon sovereign immunity. Finding that the District's activities were not "governmental," the court concluded that the Mississippi Sovereign Immunity Act did not apply. Alternatively, the court concluded that if the Act did apply, the District waived its immunity to the extent it had general liability insurance.[1] Additionally, the court granted the District partial summary judgment on PYCA's punitive damages claim. These conclusions were then embodied in an order filed October 31, 1994 that referenced the court's earlier January 18th and October 3rd opinions. This order was also certified for interlocutory appeal under both § 1292(b) and Rule 54(b). The District appeals the denial of summary judgment on the immunity issue; PYCA cross-appeals on the punitive damage issue.

---

[1]The court also rejected PYCA's argument that retroactive application of the Act violated its due process rights. This conclusion forms the basis of PYCA's conditional cross-appeal on the immunity issue.

To recap, the District appeals the district court's conclusion that it is a citizen for diversity purposes. It also appeals the denial of summary judgment on the tort claims based on sovereign immunity. Furthermore, the District appeals the denial of its motion to amend. PYCA cross-appeals on the dismissal of its punitive damage claims against the District, Foote, and O & W. We examine each of these issues in turn.

DIVERSITY JURISDICTION

As a threshold matter, the District contends that it is the alter ego of the State of Mississippi and therefore not a citizen for diversity jurisdiction purposes. In answering this jurisdictional question, the district court applied the balancing test of *Tradigrain, Inc. v. Mississippi State Port Authority,* 701 F.2d 1131 (5th Cir.1983), and concluded that the District was not the alter ego of the state. On appeal, the District argues that the *Tradigrain* analysis only applies if the District's status is unclear. Because the enabling act for the District created it as "a public body corporate and politic constituting a political subdivision of the State of Mississippi," the District argues that such analysis is inappropriate because its status is clear. *See* Senate Bill 2833, Chap. No. 885, Local & Private Laws of the State of Mississippi, § 4 (1982) (hereinafter "Enabling Act"). Alternatively, if *Tradigrain* is applied, the District contends that the balance should tip in favor of it being the alter ego of the state.

It is well-settled that a state is not a "citizen" for

6

purposes of diversity jurisdiction. *Moor v. County of Alameda,* 411 U.S. 693, 717, 93 S.Ct. 1785, 1796-97, 36 L.Ed.2d 596 (1973). If suit is brought against an agency that is the alter ego of the state, federal jurisdiction is lacking. *Tradigrain,* 701 F.2d at 1132. However, if the agency is an independent one, separate and distinct from the state, the district court can properly proceed to the merits. *Id.*

In this case, the district court properly applied *Tradigrain* analysis. The District's initial contention that *Tradigrain* does not apply is meritless. While there is language in *Tradigrain* that "[i]f the agency's status is unclear" we look to all available sources for guidance, see 701 F.2d at 1132, the fact that the District's enabling legislation describes it as a political subdivision does not make its status clear. A state statute characterizing the agency as an arm of the state is only one factor to consider in the balancing test. *McDonald v. Board of Mississippi Levee Comm'rs,* 832 F.2d 901, 906 (5th Cir.1987).

As we described in *Tradigrain,* there are many factors to consider in determining whether an agency is the alter ego of the state including: (1) whether state statutes and case law characterize the agency as an arm of the state; (2) the source of entity funding; (3) the degree of local autonomy; (4) whether the entity is concerned primarily with local, as opposed to statewide problems; (5) the authority to sue and be sued in its own name; and (6) the right to hold and use property. *See* 701 F.2d at 1132;

7

*McDonald,* 832 F.2d at 906.[2]  Typically, some factors will suggest that the agency is a "citizen," while others will suggest that it is the alter ego of the state.  *Tradigrain,* 701 F.2d at 1133.

This is precisely what occurred when we applied this test to the Mississippi State Port Authority in *Tradigrain.*  We found some factors suggested the Port Authority was a citizen.  These included:  the authority to sue and be sued in its own name;  the ability to own property and enter into contracts;  and wide discretion in exercising its duties.  *Id.*  Against these factors, many others supported the opposite view.  For example, the title to all Port Authority property vested in the State of Mississippi.  Likewise, while the Authority could issue bonds, they became general obligations of the state.  Additionally, all contracts had to be awarded pursuant to state law of public contracts.  The Authority made financial reports to the state legislature and was audited by the state auditor.  *Id.*  Most importantly, state law specifically provided that the Port Authority waived immunity from suit only to the extent of liability insurance coverage.  We concluded that "[t]he language in the statute strongly suggests that the legislature considered the Authority an alter ego of the State."  *Id.*  While the Court did not base its holding solely on this statute, its language, combined with other provisions

---

[2]The *McDonald* factors are technically a test for Eleventh Amendment immunity.  However, as we specifically stated in *Tradigrain,* "the analysis of an agency's status is virtually identical whether the case involves determination of immunity under the Eleventh Amendment or a determination of citizenship for diversity jurisdiction."  701 F.2d at 1132.

enumerated above, clearly tipped the balance in favor of finding the Port Authority as the alter ego of the State of Mississippi. *Id.* at 1134.

The application of the same balancing test to the District yields the opposite conclusion. Notwithstanding the general language in its enabling act describing the District as a political subdivision, the remaining *Tradigrain* factors indicate sufficient independence from the state for diversity purposes. Initially, the same characteristics of the Port Authority that implied it was a citizen are present here. The District has the authority to sue and be sued in its own name, as well as employ its own counsel. Enabling Act § 6(a), (*l* ). The District can own property and enter into contracts. *Id.* § 6(e), (*o*). Like the Port Authority, it has wide discretion in exercising its duties. *Id.* § 25.

However, the factors that led us to conclude that the Port Authority was the alter ego of the state are absent with the District. For example, title to the Port Authority's property vested in the state; the District holds all of its property in its own name. While both the Port Authority and the District raise funds through bonds, unlike the Port Authority, the District's bonds are not obligations of the state. *Id.* § 16. The District, unlike the Port Authority, is exempt from state purchasing laws and bid requirements. *Id.* § 23; *see* Senate Bill 2851, Chap. No. 940, Local & Private Laws of the State of Mississippi, § 6(*o*) (1984) (amending Enabling Act to include exemption from state laws regarding competition). Likewise, the District is exempt from the

9

very financial reports to the legislature that the Port Authority is required to make.  Unlike the Port Authority, there is no special legislation relating to waiver of immunity based on liability insurance coverage.  Finally, the District is concerned with wastewater treatment in three coastal counties—a local rather than statewide concern.[3]  In sum, the very factors that led this Court in *Tradigrain* to conclude that the Port Authority was the alter ego of Mississippi, leads us to the opposite conclusion for the District.  Consequently, the district court did not err in refusing to dismiss the suit against the District for lack of diversity jurisdiction.

## SOVEREIGN IMMUNITY

The fact that application of *Tradigrain* vests the federal courts with jurisdiction over this diversity lawsuit, does not silence this controversy.  Independent of the jurisdictional challenge, the District contends that as a matter of Mississippi

---

[3]The District contends that *Clark v. Tarrant County,* 798 F.2d 736 (5th Cir.1986), should be controlling on this issue.  In *Clark,* after applying the relevant factors we held that the Tarrant County Adult Probation Department was the alter ego of the state.  We opined that while at first glance the probation department appeared to address only a local concern, control over probationers was a statewide problem.  *Clark,* 798 F.2d at 745. We added that dividing the responsibilities of a state program into judicial districts was merely an administrative tool.  *Id.* However, we specifically noted that "no single factor conclusively show[ed]" that the probation department was the alter ego of the state.  *Id.*  Rather, all of the factors taken as a whole led us to that conclusion.  These additional factors included:  Texas law giving control of probation departments to district judges who are state elected officials;  funding from the state treasury;  inability to sue or be sued in its own name; and no mention of whether it could hold property in its own name or not.  *Id.* at 744-45.

state law,[4] it is entitled to sovereign immunity from all tort claims.  This requires an analysis separate and distinct from *Tradigrain.*

In *Pruett v. City of Rosedale,* 421 So.2d 1046, 1050 (Miss.1982) (en banc), the Mississippi Supreme Court abolished the judicial doctrine of sovereign immunity.  *Pruett,* however, specifically provided that its holding would not take effect until 1984.  Following *Pruett,* the Mississippi legislature enacted the Sovereign Immunity Act of 1984.  *See* Miss.Code Ann. §§ 11-46-1-23 (Supp.1995).  The Act mandated that its provisions would not apply to claims accruing prior to 1985;  claims accruing prior to 1985 would be governed by pre-*Pruett* law.[5]  Interestingly, the substantive provisions of the Sovereign Immunity Act did not take effect until *after 1993* because each successive legislature moved the effective date of the Act forward to the next year and specifically provided that pre-*Pruett* law should continue to control prior to the effective date of the Act.  *See Presley v. Mississippi State Highway Comm'n,* 608 So.2d 1288, 1292-94 (Miss.1992);  *Wesley v. Mississippi Transp. Comm'n,* 857 F.Supp. 523, 527-30 (S.D.Miss.1994).

Ultimately in *Presley,* the Mississippi Supreme Court held that the portion of the Immunity Act requiring courts to apply

---

[4]In this diversity action, it is quite clear, and no one disputes, that Mississippi state substantive law applies to the tort claims in this suit.

[5]This was contained in § 11-46-6 and has since been repealed.

11

pre-*Pruett* law was unconstitutional. Following *Presley,* the legislature amended the Act in 1993 to delete the offensive provision; this Act is currently in force today. *See* Miss.Code Ann. §§ 11-46-1—23 (Supp.1995). However, the Mississippi Supreme Court subsequently held that *Presley* should only be applied prospectively. *Robinson v. Stewart,* 655 So.2d 866, 868 (Miss.1995) (en banc) ("*Presley* has no retroactive application.").

Since *Presley* is not retroactive, the Sovereign Immunity Act of 1984 as subsequently amended governs during the post-*Pruett* and pre-*Presley* period. Consequently, pre-*Pruett* sovereign immunity law, as mandated by the Act, applies. *See Mohundro v. Alcorn County,* --- So.2d ----, ----, 1995 WL 598828, at *4 (Miss. Oct. 12, 1995); *West v. Combs,* 642 So.2d 917, 920 (Miss.1994); *Morgan v. City of Ruleville,* 627 So.2d 275, 278-79 (Miss.1993); *Wesley,* 857 F.Supp. at 528, 530; *Newsom v. Stanciel,* 850 F.Supp. 507, 515 (N.D.Miss.1994). The cause of action in this lawsuit arose during this post-*Pruett* and pre-*Presley* gap. Thus, the sovereign immunity issue is controlled by pre-*Pruett* law.

The district court denied the District's motion for summary judgment on immunity grounds for two reasons. The first basis was that the District was not afforded immunity under the specific provisions of the Act because it was performing proprietary, rather than governmental functions and that Mississippi would apply a governmental/proprietary distinction to the District.[6] Describing

---

[6]The court actually defined the District out of the Act. According to the court, the Act defines "political subdivision" as those body politic or body corporate responsible for

12

this as arguably a "leap in the law," the court offered an alternative holding. The court concluded that if the District was a political subdivision under the Act, any immunity provided could be waived to the extent it had general liability insurance. The court concluded that it had "reviewed the pertinent insurance provisions and concludes that a material issue remains whether PYCA [sic][7] has liability insurance coverage on the claims asserted." The court also rejected PYCA's argument that retroactive application of the Act violated its due process rights.

As described above, it is not the substantive provisions of the Act that govern the sovereign immunity issue in this case. Rather, it is pre-*Pruett* law as mandated by the Act that controls. Pre-*Pruett,* Mississippi law distinguished between the State and political subdivisions on the one hand and municipalities on the other. The State, its agencies and political subdivisions, were immune from suit unless immunity was waived by statute. *Grantham v. Mississippi Dep't of Corrections,* 522 So.2d 219, 222 (Miss.1988). Municipalities, however, were subject to a governmental/proprietary distinction; there was no immunity for proprietary functions. *See Webb v. Jackson,* 583 So.2d 946, 952 (Miss.1991); *see also Morgan,* 627 So.2d at 279. The Mississippi

---

governmental activities. The court then conducted the governmental/proprietary analysis to determine that the District was not governmental, ergo not a political subdivision entitled to immunity. *See* Miss.Code Ann. §§ 11-46-1(i) (defining political subdivision); 11-46-3 (blanket immunity provision) (Supp.1995).

[7]This should, of course, be the District, not PYCA.

13

Supreme Court has specifically refused to extend the governmental/proprietary distinction outside of the municipal context. *See Strait v. Pat Harrison Waterway Dist.,* 523 So.2d 36, 40 (Miss.1988), *overruled on other grounds, Churchill v. Pearl River Basin Dev. Dist.,* 619 So.2d 900 (Miss.1993); *see also Starnes v. City of Vardaman,* 580 So.2d 733, 736 (Miss.1991). *But cf. Womble v. Singing River Hosp.,* 618 So.2d 1252, 1261 (Miss.1993) (en banc) (in dicta noting that reexamination of governmental/proprietary distinction may be in order but declining to do so because of explicit statutory immunity for the entity at issue).

The district court improperly applied governmental/proprietary analysis to the District. The District was created as a "political subdivision of the State of Mississippi." Enabling Act, § 4. It is not a municipality. Consequently, under Mississippi law the governmental/proprietary distinction is simply not applicable. *See Strait,* 523 So.2d at 40. As a political subdivision, the District is immune from tort suit under pre-*Pruett* law. *Grantham,* 522 So.2d at 222.

Despite the authority indicating that the governmental/proprietary distinction is only used with municipalities, PYCA nonetheless contends that the distinction applies to the District on the strength of *Anderson v. Jackson Municipal Airport Authority,* 419 So.2d 1010 (Miss.1982) (en banc), and *Thomas v. Hilburn,* 654 So.2d 898 (Miss.1995). However, neither of these cases extend the governmental/proprietary distinction

14

outside the municipal context. In *Anderson,* the Mississippi Supreme Court applied the distinction to the Jackson Municipal Airport Authority, an entity created by the City of Jackson. The court specifically noted that "the case law from this Court is that the operation of an airport by a municipality is a proprietary or corporate activity." *Anderson,* 419 So.2d at 1010. This holding does not extend the proprietary distinction outside of the municipal context. Likewise, *Thomas* makes no such extension. *Thomas,* quoting at length the language of *Anderson,* applies the proprietary analysis to the City of Jackson's operation of a garage and towing service. 654 So.2d at 900-01. This authority only serves to reinforce that the governmental/proprietary analysis only applies to municipalities.

While we hold that the District is a political subdivision cloaked with immunity from tort suit, it could still waive its immunity to the extent that it purchased liability insurance coverage for the cause of action at issue. *See Churchill,* 619 So.2d at 905-06.[8] The district court's alternative reason for denying summary judgment was that there was a material issue about coverage. Basically, the district court took the position that, without deciding the issue, there was a "substantial probability"

---

[8]Oddly, pre-*Pruett* law would hold that immunity is only waived if insurance was purchased under express statutory authority. *See French v. Pearl River Valley Water Supply Dist.,* 394 So.2d 1385, 1388 (Miss.1981). Nonetheless, the Mississippi Supreme Court abolished this requirement and overruled *French* in *Churchill.* It specifically applied this new rule retroactively to a post-*Pruett* and pre-*Presley* claim. *See Churchill,* 619 So.2d at 906.

15

of coverage. The coverage issue, however, is a legal one for the court to decide conclusively, not conditionally. *See Radmann v. Truck Ins. Exch.,* 660 So.2d 975, 977 (Miss.1995) (en banc).

PYCA's Third Amended Complaint alleged a cause of action for "intentional interference with contractual relationship." In this count, PYCA contends the District "actively interfered with the performance of the subcontract by asserting contractual rights they did not have and threatening Max Foote with termination of the contract if Max Foote did not force PYCA to proceed." Third Amended Complaint ¶ 28. Additionally, PYCA alleged that the District intentionally required PYCA to breach its contract with its electrical suppliers. *Id.* The basis of these allegations were "unreasonable demands for furnishing and installing electrical equipment" and "impossible interpretations of the contract." *Id.* ¶ 29. As PYCA itself notes in its pleading, these allegations state an intentional interference with a contract claim.

The general liability insurance policy purchased by the District does not extend to cover intentional interference with contract claims. The policy provides coverage in three areas: bodily injury and property damage, personal and advertising injury, and medical payments. There are no claims for bodily injury, property damage, or medical payments at issue. All that could possibly remain is coverage under "personal and advertising injury." The policy defines advertising injury as "[o]ral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods,

16

products or services." However, the policy specifically limits coverage for advertising injuries to those "committed in the course of advertising your goods, products, or services." The District's alleged tortious interference clearly does not fall within this scope. *See Sentry Ins. v. R.J. Weber Co.,* 2 F.3d 554, 555-57 (5th Cir.1993).

Likewise, the personal injury coverage does not embrace PYCA's claim. The policy defines "personal injury" as injury resulting from: false arrest, detention or imprisonment; malicious prosecution; wrongful eviction; and violation of right to privacy. It also includes "[o]ral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." This language, clearly targeted at libel and slander actions, is not invoked by the allegations recounted in PYCA's tortious interference claim. We conclude that PYCA's intentional interference with contract claim is not subsumed into the policy's general coverage for personal and advertising injury. As such, the existence of the general liability insurance policy does not waive the District's sovereign immunity for this claim.

In sum, the District is a political subdivision of the State of Mississippi under pre-*Pruett* law. As a political subdivision, the District is entitled to sovereign immunity from PYCA's tort claims. Governmental/proprietary analysis, as used by the district court, is inapplicable. Furthermore, the District has not waived its immunity from the interference with contract claim by purchase

17

of general liability insurance because the policy does not provide coverage for the claim at issue.[9]

MOTION TO AMEND

The District also appeals the denial of its motion to amend its pleading to include additional claims of fraud and conspiracy against Foote, O & W, and PYCA.  This motion, raised three years into the litigation, was denied by the magistrate judge on the basis of undue delay and dilatory motive.  The district court agreed.  The district court, noting that there was "no just reason for delay," certified this order for interlocutory appeal under Rule 54(b).

Ordinarily, we review the denial of motion to amend under an abuse-of-discretion standard.  *Wimm v. Jack Eckerd Corp.,* 3 F.3d 137, 139 (5th Cir.1993).  The district court concluded that the District's late-proffered fraud amendments were premised on dilatory motive and would cause undue delay.  The court noted that the District could have raised a fraud claim in 1991 or 1992, but did not.[10]  Furthermore, by its own admission, the District

---

[9]Additionally, we reject PYCA's alternative arguments supporting the denial of summary judgment.  PYCA contends that there is an exception to sovereign immunity for intentional torts under Mississippi law.  However, PYCA's authority relates to qualified immunity for government actors, not sovereign immunity for the state, and is thus distinguishable.  *See West,* 642 So.2d at 920; *Grantham,* 522 So.2d at 225.  Likewise, PYCA's conditional cross-appeal that application of the Sovereign Immunity Act is a violation of due process is meritless.  *See Grimes v. Pearl River Valley Water Supply Dist.,* 930 F.2d 441, 444 (5th Cir.1991).

[10]The District was not limited in its discovery during this period.  Consequently, there was no reason why the District could not have discovered on its own the factual basis underlying the

acknowledges that discovery responses received in January 1993 provided it with the underlying facts to support its fraud claim. Still, there was no attempt to amend until June 1994. This was after the district court had gone to considerable efforts to winnow the issues of this complicated case for trial. Nonetheless, we decline to pass judgment on the district court's decision to deny the motion to amend.

Rule 54(b) of the Federal Rules of Civil Procedure provides that "the court may direct entry of a final judgment as to one or more but fewer than all of the claims ... only upon an express determination that there is no just reason for delay and upon express direction for the entry of judgment." The propriety of a Rule 54(b) certification is reviewable by this Court for abuse of discretion. *Sears, Roebuck & Co. v. Mackey,* 351 U.S. 427, 437, 76 S.Ct. 895, 900-01, 100 L.Ed. 1297 (1956). One of the primary policies behind requiring a justification for Rule 54(b) certification is to avoid piecemeal appeals. *Ansam Assocs., Inc. v. Cola Petroleum, Ltd.,* 760 F.2d 442, 445 (2d Cir.1985). A district court should grant certification only when there exists some danger of hardship or injustice through delay which would be alleviated by immediate appeal; it should not be entered routinely as a courtesy to counsel. *Id.*

We conclude that the district court's certification of this denial of a motion to amend was improper. The district court's certification articulates no hardship or danger warranting

_____

fraud claim.

19

immediate appeal of this nondispositive motion.[11]  Furthermore, the district court's Rule 54(b) certification does not perfect appealability if the order is not the final determination of a claim.  *Lockett v. General Fin. Loan Co. of Downtown,* 623 F.2d 1128, 1129 (5th Cir.1980).  Denial of leave to amend is ordinarily not final for purposes of appeal.  *Id.; Wells v. South Main Bank,* 532 F.2d 1005, 1006 (5th Cir.1976); *see also Offshore Logistics Servs., Inc. v. Mutual Marine Office, Inc.,* 639 F.2d 1168, 1170 (5th Cir.1981).  The district court abused its discretion in certifying this order for immediate appeal and we therefore dismiss the appeal on this issue.

## PUNITIVE DAMAGES

PYCA cross-appeals the district court's orders granting partial summary judgment for the District, Foote, and O & W on its punitive damages claims.  As to the District, we have concluded above that it is a political subdivision entitled to sovereign immunity from tort claims.  This, of course, includes any punitive damage claims arising from the alleged torts.  The denial of the punitive damage claim against the District was therefore proper.

As to Foote and O & W, we dismiss PYCA's appeal for lack of appellate jurisdiction.  While the district court generously certified many issues and orders to us, the punitive damages

---

[11]The district court itself noted the nondispositive nature of the motion in its October 3, 1994 order overruling the District's objections to the magistrate judge's order.  The district court recounted that it reviewed the magistrate judge's order under a "clearly erroneous or contrary to law" standard as provided by Federal Rule of Civil Procedure 72(a) relating to nondispositive matters.

summary judgments for Foote and O & W are not among them.  The district court certified only:  (1) the order filed February 9, 1994, referencing the January 18th opinion discussing jurisdiction; (2) the order filed October 3, 1994, relating to denial of motion to amend;  and (3) the order filed October 31, 1994, referencing the October 3rd opinion concerning sovereign immunity and punitive damages *against the District only.*  Since Foote's summary judgment stems from an independent order, filed January 31, 1994, that has not been certified for interlocutory appeal, we grant Foote's pending motion and dismiss for lack of jurisdiction.[12]

PYCA's cross-appeal against O & W has a similar fate.  While O & W was initially denied summary judgment on punitive damages in the same opinion and order granting Foote's, the court subsequently granted summary judgment to O & W in a motion for clarification.  In this order, filed November 8, 1994, the court found, as a matter of law, that O & W was an agent of the District and could not be liable for punitive damages.  This order has not been certified for interlocutory appeal.  Consequently, we grant O & W's pending motion and dismiss the cross-appeal for lack of appellate jurisdiction.[13]

_____

[12]We reject PYCA's contention that both January 18th opinions are somehow included in the interlocutory appeal via the certification order.  The certification order specifically mentions only the February 9th, October 3rd, and October 31st orders.  Foote's partial summary judgment stems from a January 31st order.

[13]We also reject PYCA's additional arguments suggesting that this Court should exercise jurisdiction.  The relevant issues with respect to the District are its status as a citizen and its claim of sovereign immunity.  The relevant issues with respect to

CONCLUSION

The district court properly exercised diversity jurisdiction over this complex commercial lawsuit. However, because we hold that the District is entitled to sovereign immunity, we DISMISS the tort claims lodged against the District. In as much as the District's entitlement to sovereign immunity precludes recovery for both tort and punitive damages, we AFFIRM that part of the judgment dismissing punitive damage claims against the District. Further, the appeal of the order denying the District's motion to amend is DISMISSED. Finally, we grant Foote and O & W's motion to DISMISS PYCA's cross-appeal for lack of jurisdiction.

---

Foote and O & W are not related to the District's issues, but principally concern contract interpretation and agency. Pendent appellate jurisdiction is inappropriate because the relevant issues to Foote and O & W are not inexplicably intertwined with the issue relevant to the District. *See Garner v. Wolfinbarger,* 433 F.2d 117, 120 (5th Cir.1970) (counseling against exercise of pendent appellate jurisdiction even when record is before us and parties want resolution). Likewise, the collateral order doctrine is not applicable because the orders granting partial summary judgment to these parties on the punitive damage issue would still be reviewable on appeal from a final judgment on the merits. *See Kershaw v. Shalala,* 9 F.3d 11, 14 (5th Cir.1993) (listing prerequisites for collateral review).